**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**RICHARD M. GOODMAN,**

                **Plaintiff(s),**         **CASE NUMBER: 04-75011**
                                        **HONORABLE VICTORIA A. ROBERTS**

**v.**

**CHARLES G. MADY, CHARLES A. MADY,**
**and EXCLUSIVE REALTY, L.L.C.,**

                **Defendant(s).**
_____/

**ORDER**

**I.    INTRODUCTION**

This matter is before the Court on Defendant Charles A. Mady and Exclusive Realty, LLC's Motion to Dismiss and Defendant Charles G. Mady's Motion for Stay. Defendants' A. Mady and Exclusive Realty's motion is **GRANTED IN PART AND DENIED IN PART**.  Defendant G. Mady's motion for a stay is **GRANTED**.

**II.   BACKGROUND**

Plaintiff Richard Goodman brings this action to recover losses that he sustained from a so-called "Ponzi" scheme[1] allegedly orchestrated by Defendant Charles G. Mady ("G. Mady") and his father, Defendant Charles A. Mady ("A. Mady").  A. Mady is the President, Chief Executive Officer and principal stockholder of Defendant Exclusive

_____

[1]A "Ponzi" scheme is defined as "an investment swindle in which some early investors are paid off with money put up by later ones in order to encourage more and bigger risks."  *Merriam-Webster's Online Collegiate Dictionary, Tenth Edition.*

1

Realty, L.L.C. ("Exclusive Realty").  Per Plaintiff, G. Mady was an employee of Exclusive Realty at all relevant times.  Between 2000 and 2002, Plaintiff alleges that the Mady Defendants cheated him out of approximately $6 million.  He further alleges that Exclusive Realty is vicariously liable as the Mady Defendants' employers, and that it is a co-conspirator with the Mady Defendants.  The facts are taken from Plaintiff's complaint and they are presumed true.

In early 2000, A. Mady introduced Plaintiff to his son, whom he represented was a successful commodities trader.  Per Plaintiff, A. Mady further represented that he retained control over G. Mady's investment operations.  Plaintiff asserts that he relied upon A. Mady's representations about G. Mady in part because of A. Mady's own business successes and reputation.  In April or May of 2000, Plaintiff met with G. Mady and later entered into a business arrangement with him.  Plaintiff agreed to invest money with G. Mady for the purpose of trading commodity futures.  Plaintiff and G. Mady decided that the profits would be divided between them in accordance with a pre-arranged agreement.

During the year 2000, Plaintiff gave G. Mady $250,000.  In January 2001, G. Mady returned Plaintiff's investment plus $62,500 that he claimed was generated from trading profits.  Between February 2001 and April 2002, Plaintiff gave G. Mady an additional $6.7 million.  In February 2001, Plaintiff transferred $1 million to G. Mady's personal account for investment.  Plaintiff says that it was at this point that G. Mady began creating false account statements purportedly generated from G. Mady's personal trading account at Lind-Waldock, Inc., a registered futures commission merchant that is headquartered in Chicago, Illinois.  The statements purportedly

2

pertained to Plaintiff's investments and denoted the actual cash value of the account as the "NLV," or net liquidation value.  G. Mady submitted an account statement to Plaintiff's accountant on May 17, 2001, which stated that the NLV was $2,401,815.  In fact, however, Plaintiff says he later learned that the NLV was actually $446,457.09.  Based on G. Mady's apparent success, Plaintiff says he made another $1 million transfer to G. Mady on May 24, 2001.  In June and July 2001, Plaintiff says that he received two more false account statements.  Again, the June 27th statement said the NLV was $2,375,149, although the actual NLV was only $375,149.01.  Similarly, the July 11th statement said that the NLV was $2,704,998, when the actual NLV was only $300,146.51.

In August 2001, Plaintiff and G. Mady formed Mady Funding Company, LLC ("Mady Funding").  Thereafter, Plaintiff transferred an additional $2 million to G. Mady.  From September through November 2001, Plaintiff received monthly distributions from G. Mady, each in the amount of $83,333.  Between August and November 25, 2001, Plaintiff received eight more false account statements overstating the value of the Lind-Waldock account.  For instance, the November 9th statement indicated that the NLV was $4,381,570, when it was actually $61,268.92.  Therefore, in November 2001, Plaintiff invested another $1 million, bringing the total investment to that date to $5 million.

Between November 25, 2001 and January 25, 2002, Plaintiff says that he received six more false account statements.  The January 16, 2002 statement represented that the NLV was $5,622,000.  However, the actual NLV was $145.31.  Plaintiff made his final investment of $1 million in January 2002.  Thereafter, in January, February and April, G. Mady made distributions to Plaintiff in various amounts totaling

3

approximately $500,000.  Finally, in early 2002, Plaintiff loaned G. Mady $700,000, which Plaintiff says was never repaid.

In April 2002, Plaintiff says that G. Mady advised that he no longer wished to make commodity futures trades on Plaintiff's behalf or on behalf of Mady Funding.  G. Mady said that he would return Plaintiff's $6 million plus profits and other sums Plaintiff says he loaned to Defendant.  Plaintiff says G. Mady continued to submit false account statements through mid-2002.  A May 17, 2002 statement showed an NLV exceeding $6 million, although the actual balance was $866.

At some point after Plaintiff's dealings with G. Mady were concluded, Plaintiff alleges that A. Mady induced him to refrain from taking legal action by assuring him that G. Mady still had all or a substantial part of Plaintiff's money, and that it would be repaid to Plaintiff.  Later, Plaintiff says that A. Mady actually entered into an agreement to repay the money Plaintiff gave to G. Mady, in exchange for a release of liability. However, Plaintiff never received any money from either of the Madys.

A civil action was later brought against G. Mady, Mady Funding, and Mady Futures, Inc. by the Commodity Futures Trading Commission ("CFTC") for violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. §1, *et seq.*[2]  The CFTC alleged that G. Mady: 1) misappropriated funds solicited for use in trading commodity futures and options, issued false account statements, and misrepresented the profitability of his trading; 2) acted as a commodity pool operator without the benefit of registration and defrauded at least one commodity pool participant; and 3) commingled funds of the pool

---

[2]*See Commodity Futures Trading Commission v Mady* ("*CFTC v Mady"),* U.S. Eastern District Court Case No. 02-72394.

with his own funds and those of at least one other person.  The complaint was based on Plaintiff's allegations set forth above as well as the claims of other individuals.  Plaintiff asserts that as many as 40 other people were duped.

On November 6, 2003, G. Mady settled the civil action via a Consent Order.  G. Mady did not admit or deny the allegations against him, but he agreed to a permanent injunction prohibiting him from: 1) violating various provisions of the CEA; 2) soliciting or accepting funds in connection with the purchase or sale of commodity futures or options; 3) engaging, controlling or directing the trade of commodity futures or options on behalf of others; 4) introducing customers to persons engaged in the business of commodity futures or options; and 5) issuing statements or reports regarding commodity futures or options.  G. Mady also agreed not to trade commodity futures or options for ten years, or ever apply for registration with the CFTC.  Lastly, G. Mady was ordered to make restitution to investors in the amount of $8,220,860, plus interest.

In May 2004, G. Mady was indicted on federal charges.[3]   A second superceding indictment was filed in the case on January 13, 2005 and charges him with mail fraud, wire fraud, embezzlement of commodity pool funds, operating an unregistered commodity pool, and money laundering.  The case is pending.

On December 23, 2004, Plaintiff filed a motion in the CFTC civil action against both G. Mady and A. Mady.  He requested an evidentiary hearing and judgment of contempt.  The motion was based on the Mady Defendants' alleged violations of the Consent Order.  Plaintiff alleged that G. Mady: 1) failed to make required restitution

_____

[3]*United States of America v Mady,* U.S. Eastern District Court Case No. 04-80408.

5

payments; 2) continued to engage in options trading; and 3) transferred an interest in real estate to A. Mady at a discount. The Court denied the motion on several grounds. First, although Plaintiff is a third-party beneficiary of the Consent Order,[4] the Order limited the relief such persons can request to enforcement of G. Mady's restitution obligations. Therefore, the Court found that Plaintiff did not have standing to request an evidentiary hearing regarding G. Mady's alleged trading activities or transfer of real estate. Second, the Court found that Plaintiff's claims regarding restitution were premature, as the payment referenced was not yet due. Lastly, the Court found that Plaintiff was not entitled to a judgment of contempt against A. Mady, because he was not a party to the Consent Order.

Plaintiff also brought this fourteen-count action on December 23, 2004. Six counts are brought against G. Mady alone: violation of commission regulations by fraud and misappropriation (Count I); miscellaneous acts in aid of the statutory violations alleged in Count I (Count II); common law fraud (Count IV); negligence and gross, wanton and willful negligence (Count V); conspiracy (Count VI); and, conversion (Count VII). Five counts are brought against A. Mady alone: conspiracy (Count VIII); actual and

---

[4]The Consent Order includes a provision allowing certain persons to bring an action for enforcement of the Order under limited circumstances:

> <u>Third-Party Beneficiaries</u>: Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each of the individuals identified in the Commission Letter is explicitly made an intended third-party beneficiary of this Order and may seek to enforce obedience of this Order to obtain satisfaction of any portion of the restitution amount which has not been paid by Defendant.

Consent Order at ¶5(5).

apparent agency (Count IX); liability under the CEA as an aider and abettor (Count X); intentional and/or negligent and reckless infliction of emotional injury (Count XI); and, breach of contract (Count XII). One count is brought against Exclusive Realty for vicarious liability and co-conspiracy (Count XIII). Both G. Mady and A. Mady are alleged to have violated the November 2003 Consent Order (Count III), and all Defendants are alleged to have violated the Racketeer Influenced Corrupt Organization Act ("RICO")(Count XIV).

Defendants A. Mady and Exclusive Realty move for dismissal of each count brought against them.

## III.   ANALYSIS

### A.   DEFENDANTS A. MADY AND EXCLUSIVE REALTY'S MOTION TO DISMISS

#### i.   STANDARD OF REVIEW

Defendants A. Mady and Exclusive Realty bring their motion pursuant to FRCP 9(b) and 12(b)(6).[5] When reviewing a Rule 12(b)(6) Motion, the trial court "must construe the complaint liberally in the plaintiff's favor and accept as true all factual allegations and permissible inferences therein." *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994); *see also Miller v. Currie*, 50 F.3d 373, 377 (6th Cir. 1995). Because a Rule 12(b)(6) motion rests upon the pleadings rather than the evidence, "[i]t is not the function of the court [in ruling on such a motion] to weigh evidence or evaluate the credibility of the witnesses." *Miller*, 50 F.3d at 377. The court should deny a Rule

---

[5]Defendants alternatively request summary judgment pursuant to FRCP 56(c) if it is necessary for the Court to consider evidence outside the pleadings. As it is not necessary, Defendants' motion is considered under FRCP 9(b) and 12(b)(6) only.

12(b)(6) motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v Gibson,* 355 U.S. 41, 45-46 (1957). *See also Gazette*, 41 F.3d at 1064; *Miller*, 50 F.3d at 377. "While this standard is decidedly liberal, it requires more than the bare assertion of legal conclusions." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993). Rather, the complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory." *DeLorean*, 991 F.2d at 1240 (citations omitted).

Notwithstanding the liberal standard required under FRCP 12(b)(6), when fraud is alleged, FRCP 9(b) requires that the allegations "be stated with particularity." The particularity requirement of Rule 9(b) serves three purposes:

> 1) it ensures that allegations are specific enough to inform a defendant of the act of which the plaintiff complains, and to enable him to prepare an effective response and defense; 2) it eliminates those complaints filed as a pretext for the discovery of unknown wrongs--a 9(b) claimant must know what his claim is when he files; and 3) it seeks to protect defendant from unfounded charges of wrongdoing which injure their reputations and goodwill.

*Bovee v Coopers & Lybrand C.P.A.,* 272 F.3d 356, 361-362 (6th Cir. 2001)(*quoting Vennittilli v Primerica, Inc.,* 943 F. Supp. 793, 798 (E.D. Mich. 1996)). Consequently, "[c]onclusory allegations that a defendant's conduct was fraudulent are insufficient." *In re Air Crash Disaster at Detroit Metro. Airport v Northwest Airlines, Inc.* 737 F.Supp. 406, 407 (E.D. Mich. 1989); *Bovee,* 272 F.3d at 361. "Instead, the complaint must describe the conduct that allegedly constitutes the fraud with some specificity." *Id.* "Plaintiffs may not simply rely on the proposition that Defendants must have known or should have known of, and participated in, the fraud." *Bovee*, 272 F.3d at 361.

8

### ii.      Count III--Violation of Consent Order

In Count III, Plaintiff asserts that A. Mady violated the Consent Order entered in

*CFTC v Mady.*  However, the basis of this allegation is unclear.  Plaintiff only references

A. Mady in paragraph 42, in which he states:

> Co-Defendant Charles A. Mady, with actual knowledge of the terms
> and conditions of the Consent Order, has specifically acted in
> concert with Defendant Charles G. Mady in connection with the
> obligations of the preceding paragraphs, as more fully set forth in
> paragraphs 63 and 90 below.

First Amended Complaint at ¶42.  Contrary to Plaintiff's assertion, neither paragraph 63

nor paragraph 90 sheds any light on the alleged violation.  Paragraph 63 only pertains

to the jurisdictional basis of Plaintiff's conspiracy claim in Count VIII.  Paragraph 90 is

the final paragraph of Plaintiff's breach of contract claim in Count XII, and he merely

alleges that he has sustained damages as a result of the alleged breach.

The Court finds that these allegations are insufficient to state a claim for violation

of the Consent Order by A. Mady.  Furthermore, in its February 2005 Order in *CFTC v*

*Mady*, the Court already rejected Plaintiff's attempt to assert a claim against A. Mady

under the Consent Order, because A. Mady was not a party to it.  Defendants' motion to

dismiss this claim is granted.

### iii.      Count VIII--Conspiracy (A. Mady)

In Count VIII, Plaintiff generally alleges that G. Mady participated with A. Mady

and others in a conspiracy from 2000 to 2004 and continuing to the present.  He further

alleges that A. Mady participated in the "Ponzi" scheme after early 2002 by falsely

telling Plaintiff that G. Mady still had Plaintiff's money and that it would be repaid.

9

"Civil conspiracy is a combination of two or more persons, by some concerted action, to accomplish a lawful purpose by criminal or unlawful means."  *Temborius v Slatkin*, 157 Mich. App. 587, 599-600 (1986).  However,"[a]n allegation of civil conspiracy, standing alone, is not actionable[.]" *Cousineau v Ford Motor Company,* 140 Mich. App. 19, 36 (1985), *cert. den.,* 474 U.S. 971 (1985).  A plaintiff must prove that there was an agreement or preconceived plan to commit an unlawful act.  *Temborius*, 157 Mich. App. at 600; *Cousineau*, 140 Mich. App. at 37.  The agreement may be proven with either direct or circumstantial evidence, or by inference.  *Id.*  "It is sufficient if the circumstances, acts and conduct of the parties establish an agreement in fact." *Temborius*, 157 Mich. App. at 600.  However, it is not sufficient to simply allege a "concert of action" as the unlawful act, without an underlying unlawful act.  "'Concert of action' cannot be the tort or unlawful action underlying a conspiracy claim.  Concert of action is itself a claim which, like conspiracy, cannot exist independently of an underlying tortious act." *Cousineau*, 140 Mich. App. at 37.

Plaintiff adequately pled civil conspiracy against A. Mady.  The alleged unlawful acts are the "Ponzi" scheme and A. Mady's subsequent fraudulent statements regarding the disposition of Plaintiff's money, which Plaintiff says A. Mady made in an attempt to help G. Mady conceal his unlawful acts.  *See* First Amended Complaint at ¶¶65-68.  The alleged evidence of the agreement between the Mady Defendants to commit these acts is that A. Mady represented to Plaintiff that G. Mady was a successful commodities trader, which Plaintiff claims was a ruse to induce Plaintiff to invest funds with G. Mady.

10

*Id* at ¶9, 71, 72.[6]  After the scheme was discovered, A. Mady allegedly made false representations to Plaintiff concerning the location of the money Plaintiff invested and that Plaintiff would be repaid.  *Id* at 65-68.  One could infer that the Mady Defendants were acting in concert from A. Mady's claimed knowledge of the location of the money and his alleged promise to refund it himself.

Contrary to Defendant's claim, these allegations also sufficiently allege the underlying fraud.  "As a general rule, actionable fraud consists of the following elements: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage."  *DiPonio Const. Co., Inc. v Rosati Masonry Co., Inc.*, 246 Mich. App. 43, 51 (2001), *app. den.,* 465 Mich. 897 (2001).  The alleged misrepresentation by A. Mady was that he knew that G. Mady still had Plaintiff's money and would return it.  *See* First Amended Complaint at ¶¶65-68.  Plaintiff further alleges that A. Mady knew these representations to be false when he made them, that he made the statements so that Plaintiff would delay taking action to recover the money, that Plaintiff did delay, and that, as a result, Plaintiff suffered monetary losses, including the cost of attempting to recover the money.  *Id* at 65-69.

---

[6]The factual allegations in paragraphs 71 and 72 are actually listed in support of Count IX, actual agency.  Rather than list all of the relevant facts in the beginning of the complaint, Plaintiff incorporated them into the enumerated counts.  This deficiency is easily remedied with amendment of the complaint.

11

Although Plaintiff's complaint is not artfully pled, his only obligation under both FRCP 8 and 9(b) is to plead his claim with sufficient specificity to put Defendants on notice of the nature of the claim. *See Michaels Building Company v Ameritrust Co.,* 848 F.2d 674, 680 (6th Cir. 1988)(Rule 9(b) "requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim."); *Memphis Tenn., Area Local, American Postal Workers Union, AFL-CIO v City of Memphis,* 361 F.3d 898, 902 (6th Cir. 2004)("Under the liberal notice pleading rules [of FRCP 8], a complaint need only put a party on notice of the claim being asserted against it to satisfy the federal rule requirement of stating a claim upon which relief can be granted."). Considering the allegations in his complaint in their entirety, Plaintiff met this requirement. Defendant A. Mady's motion to dismiss Count VIII is denied.

### iv.    Count IX--Actual and Apparent Agency

In Count IX, which is only alleged against A. Mady, Plaintiff says that the Mady Defendants had an actual or apparent (also called "ostensible") agency relationship. The factual basis of this claim is that A. Mady held himself out during all relevant times as the principal in control of G. Mady's commodities trading activities. Specifically, Plaintiff says that A. Mady said "that because of the fact that close friends and important business associates would be involved in the investments and because of his own well-established business reputation in the Detroit business community, [he] had ultimate control over the investment operations of his son and employee, Defendant [G. Mady]." First Amended Complaint at ¶72. Plaintiff says that he relied on these representations to his detriment. Therefore, he asserts that A. Mady is vicariously liable as a principal for the acts of G. Mady, who he says was acting as A. Mady's agent and employee. He

12

also asserts that there was actual and apparent agency by virtue of the Mady

Defendants' Exclusive Realty employment relationship, and that A. Mady aided and

abetted G. Mady to carry out and conceal G. Mady's unlawful conduct.

"An agency relationship may arise when there is a manifestation by the principal

that the agent may act on his account." *Meretta v Peach*, 195 Mich. App. 695, 697

(1992).  "The test of whether an agency has been created is whether the principal has a

right to control the actions of the agent." *Id.*  An agent's authority may be either actual

or apparent.  *See Id; Little v Howard Johnson Co.,* 183 Mich. App. 675, 683 (1990).

Actual authority may be express or implied.  "Implied authority is the authority which an

agent believes he possesses." *Meretta,* 195 Mich. App. at 698.

"Apparent authority may arise when acts and appearances lead a third person

reasonably to believe that an agency relationship exists." *Id* at 698-699.  A court must

consider all surrounding facts and circumstances to determine whether an agent had

apparent authority to perform a particular act.  *Id* at 699.  Michigan courts utilize a three-

part test in analyzing vicarious liability under a theory of apparent agency:

> [First] The person dealing with the agent must do so with belief in the
> agent's authority and this belief must be a reasonable one; [second]
> such belief must be generated by some act or neglect of the principal
> sought to be charged; [third] and the third person relying on the
> agent's apparent authority must not be guilty of negligence.

*Little*, 183 Mich. App. at 683 (citations omitted).  "Hence, the alleged principal must have

made a representation that leads the plaintiff to reasonably believe that an agency

existed and to suffer harm on account of a justifiable reliance thereon."  *Id.*

### 1.    Commodities Trading

Plaintiff alleges a *prima facie* claim of actual and apparent agency with respect to

13

G. Mady's commodities futures trading activities.  According to Plaintiff, A. Mady claimed to have an actual principal-agent relationship with G. Mady by asserting that he had the right to control G. Mady's trading activities.  Plaintiff also stated a claim for apparent agency based on the same alleged representation, as well as Plaintiff's claim that he relied on A. Mady's representations in deciding to conduct business with G. Mady.  *See* First Amended Complaint at ¶73.  Although Plaintiff does not expressly assert that he was not guilty of negligence, he claims to have been an innocent victim of fraud.

### 2.     Exclusive Realty Employment

On the other hand, Plaintiff has not stated a *prima facie* claim of actual or apparent agency based on A. Mady and G. Mady's employment relationship.  Based on the allegations in Count XIII, the Court presumes that Plaintiff is referring to their employment relationship through Exclusive Realty.  Plaintiff alleges that A. Mady is the President, CEO and principal stockholder of Exclusive Realty and that G. Mady was an employee of the company.  However, Plaintiff does not allege that A. Mady claimed a right to control G. Mady's activities in his capacity as the President and CEO of Exclusive Realty.  Nor does Plaintiff allege that either of the Mady Defendants held out G. Mady's alleged employment with Exclusive Realty as a means of inducing him to begin or continue investing money with G. Mady, or that either of them used the alleged employment relationship to facilitate the scheme.  Plaintiff failed to state a claim under this theory.

### 3.     Aiding and Abetting

Plaintiff's claim that A. Mady is vicariously liable as an aider and abettor also fails

14

as a matter of law.  First, it is not clear that Michigan recognizes a civil aiding and

abetting claim.  In an unpublished opinion, the Michigan Court of Appeals recently

acknowledged such a claim, stating:

> The essential elements required for aiding and abetting liability are:
> (1) that an independent wrong exist; (2) that the aider or abettor
> know of the wrong's existence; and (3) that substantial assistance be
> given to effecting that wrong. *Restatement Torts, 2d* §876(b).  The
> alleged abettor is required to have the same degree of scienter as
> the person committing the actual fraud.

*Carson Fischer, PLC v. Standard Federal Bank*, 2005 WL 292343, *6 (February 8,

2005).  Nonetheless, it does not appear that either the Michigan Court of Appeals or the

Michigan Supreme Court has formally allowed such a claim.  Plaintiff does not address

this question directly.  Instead, he cites cases involving claims of conspiracy, federal

aiding and abetting, and a Michigan claim called "concert of action."[7]  None of these

cases is instructive.  And, in any event, Plaintiff's allegation of civil aiding and abetting is

duplicative of Plaintiff's conspiracy (Count VIII) and federal aiding and abetting (Count

X) claims.

### v.    Count X--Liability under the Commodities Exchange Act

In Count X, Plaintiff alleges that A. Mady is liable as an aider and abettor under 7

U.S.C. §25(a)(1) of the Commodities Exchange Act ("CEA"), because he falsely

---

[7]*Solomon v United States,* 276 F.2d 669, 675 (6th Cir. 1960), *cert. den.,* 364 U.S.
890 (1960)(liability of co-conspirators is joint and several); *Hooks v Hooks,* 771 F.2d
935, 943 (6th Cir. 1985)(civil conspiracy); *McKinnon City of Berwyn,* 750 F.2d 1383,
1386 (7th Cir 1984)(joint liability applies when defendants conspired against plaintiff);
*Temborious,* 157 Mich. App. at 599-600 (civil conspiracy); *Cousineau,* 140 Mich. App. at
32 ("A plaintiff may proceed on the theory of concert of action if he or she can prove
'that all defendants acted tortiously pursuant to a common design.'")(citation omitted);
*SEC v Washington County Utility District,* 676 F.2d 218, 224-227 (6th Cir. 1981)(federal
aiding and abetting claim).

15

represented after June 2002 that G. Mady still had all or most of Plaintiff's money, that he (A. Mady) would ensure that the money was repaid to Plaintiff, and that G. Mady had not stolen, embezzled or misappropriated the money.  Plaintiff alleges that A. Mady made these representation knowing that, in fact, G. Mady intended to commit CEA violations.  Per Plaintiff, A. Mady's intention was to further G. Mady's fraudulent schemes.

Under 7 U.S.C.§25(a)(1), one may bring a private cause of action against a person who directly violates the CEA, or who aids and abets a violation:

(a) Actual damages; actionable transactions; exclusive remedy

**(1)** Any person . . . ***who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter*** shall be liable for actual damages resulting from one or more of the transactions referred to in subparagraphs (A) through (D) of this paragraph and caused by such violation to any other person--

**(A)** who received trading advice from such person for a fee;

**(B)** who made through such person any contract of sale of any commodity for future delivery (or option on such contract or any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract;

**(C)** who purchased from or sold to such person or placed through such person an order for the purchase or sale of--

    **(i)** an option subject to section 6c of this title (other than an option purchased or sold on a registered entity or other board of trade);

    **(ii)** a contract subject to section 23 of this title; or

    **(iii)** an interest or participation in a commodity pool; or

**(D)** who purchased or sold a contract referred to in subparagraph (B) hereof if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract.

In order to state an aiding and abetting claim under this section, a plaintiff must allege that the defendant: 1) had knowledge of the principal's intent to commit a violation of the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective.  *Damato v Hermanson,* 153 F.3d 464, 473 (7th Cir. 1998).

Plaintiff pled facts sufficient to satisfy these elements.  He alleges that A. Mady induced him to begin trading with G. Mady by asserting that G. Mady was a successful trader, and that he (A. Mady) maintained actual control over G. Mady's trading activities. And, after the scheme was exposed, A. Mady allegedly made false statements regarding the whereabouts of the money and offered to refund Plaintiff's money, all in an effort to help G. Mady escape detection, says Plaintiff.  Assuming these assertions to be true, one could infer that A. Mady knew about the scheme from the beginning, that he intended to and did assist G. Mady by recruiting "investors" such as Plaintiff, and that he further assisted G. Mady in avoiding detection of the scheme by offering false assurances to Plaintiff regarding the disposition of the money Plaintiff invested.

### vi.   Count XI--Intentional and /or Negligent and Reckless Infliction of Emotional Injury

In Count XI, Plaintiff alleges that, after June 2002, A. Mady represented that G. Mady had not misappropriated Plaintiff's money, that all or most of it was still in G. Mady's possession, and that either he or G. Mady would repay the funds.  Plaintiff asserts, however, that A. Mady never intended to repay Plaintiff and, in fact, has not done so.  He contends that A. Mady's statements were made in reckless disregard,

17

intentionally and maliciously such that they caused Plaintiff extreme mental and emotional distress.

### 1.    IIED

To state a claim for Intentional Infliction of Emotional Distress (IIED), Plaintiff must allege: (1) 'extreme and outrageous' conduct;  (2) intent or recklessness;  (3) causation;  and (4) 'severe emotional distress.'  *Roberts v Auto-Owners Ins. Co.*, 422 Mich. 594, 602 (1985).  Quoting the Restatement, the *Roberts* court described the element of extreme and outrageous conduct as follows:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!

422 Mich. at 603.  Liability does not extend to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Ledsinger v. Burmeister*, 114 Mich. App. 12, 18 (1982)(citing *Warren v June's Mobile Home Village & Sales, Inc*, 66 Mich. App. 386, 390 (1976)).  "Whether a defendant's acts were sufficiently outrageous depends upon the context in which the defendant committed them."  *Bhama v Bhama*, 169 Mich. App. 73, 80 (1988).  For instance, the extreme and outrageous character of a defendant's conduct may arise when a defendant abuses a relationship which puts him in a position of actual or apparent authority over plaintiff or gives the defendant power to affect plaintiff's interests. *Warren,* 66 Mich. App. at 391.

Again quoting the Restatement, the *Roberts* court described the severe

18

emotional distress requirement as follows:

> [Emotional distress] includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquillity is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. *The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. (*emphasis in original).

422 Mich. at 609.  Seeking and receiving medical treatment is not a condition precedent to satisfying the element of severe emotional distress.  *McCahill v Commercial Union Ins. Co*, 179 Mich. App. 761, 771 (1989).  However, where a claim is based on emotional injury alone, "more in the way of outrage" may be required.  *Roberts*, 422 Mich. at 609 (citing Restatement Torts, 2d § 46, Comment K, p. 78).

It is not clear whether Plaintiff asserts this claim solely based on A. Mady's alleged statements after 2002, or if he intended to incorporate the whole of his allegations prior to that time as well.  To the extent the claim is based solely on A. Mady's statements after 2002, it fails as a matter of law.  The Michigan Court of Appeals has stated that breach of contract is not an appropriate basis for an IIED claim.  "The mere failure to pay a contractual obligation, without more, does not amount to outrageous conduct for the purpose of this tort," even if the breach is willful or in bad faith.  *Wendt v Auto Owners Ins. Co.,* 156 Mich. App. 19, 25 (1986).

If, however, Plaintiff's claim is based on A. Mady's alleged collusion with G. Mady over several years, the issue is less clear.  Plaintiff alleges an intricate investment scheme that spanned several years and resulted in him losing a substantial amount of money.  Although Michigan courts have found a *prima facie* case of IIED in a variety of

19

situations,[8] the parties do not cite and the Court has not found any state or federal

Michigan cases addressing an IIED claim on similar facts.  However, one federal court

found on facts similar to those alleged here that investment losses due to fraud are not

sufficiently extreme and outrageous to state a claim.  In *Kimmel v Peterson,* 565

F.Supp. 476 (E.D. Pa. 1983), plaintiff, a physician, entrusted his money with defendant

brokers and requested that they make conservative investment decisions on his behalf.

Instead, defendants purchased high risk stocks, often inducing plaintiff to agree to their

purchase by giving him insufficient, false or misleading information.  Defendants also

persuaded plaintiff to invest in their company and become a limited partner, all without

disclosing the risks and by misrepresenting the company's financial health.  Defendants

also used one investment of $450,000 that was intended for another purpose, to

increase plaintiff's partnership interest without his knowledge.  Ultimately, plaintiff lost

his life savings and funds earmarked for his children's education.  Plaintiff filed suit

---

[8]For instance:  *Haverbush v Powelson*, 217 Mich App 228 (1996)(defendant
stalked plaintiff over a two year period by sending a barrage of threatening and
derogatory letters to defendant and his family, left lingerie on his vehicles and at his
residence, left an ax and a hatchet on his vehicles and suggested to a co-worker that
someone should "ice" him); *Doe v Mills*, 212 Mich App 73 (1995)(abortion protestors
publicly displayed plaintiffs' names and the fact of their abortions on large signs outside
of an abortion clinic in full view of the public); *Johnson v Wayne County*, 213 Mich App
143 (1995)(plaintiff was placed in a cell, on two separate occasions, with a defendant
after serving as a juror on the defendant's (5-count murder) case while deputy sheriffs
looked into the cell and laughed at plaintiff); *Bhama v Bhama*, 169 Mich App 73
(1988)(divorced father (a psychiatrist) deliberately destroyed a parent-child relationship
by allegedly using his training in psychiatry over an extended period of time to
"systematically" manipulate and brainwash minor children into "totally rejecting" their
mother); *Margita v Diamond Mortgage Corp*, 159 Mich App 181 (1987)(overbearing
mortgage lender made repeated verbal and written threats of collection and foreclosure
(often including insults and profanity), over a two-year period, although plaintiffs were at
all times current on their mortgage).

alleging, *inter alia*, intentional infliction of emotional distress.  Defendants moved to dismiss the claim.

The *Kimmel* court granted defendants' motion finding that their alleged acts were not sufficiently extreme and outrageous.  Plaintiff argued that his was not a "garden variety" securities fraud case, but rather a protracted course of fraud perpetrated by a trusted advisor.  The court rejected this argument stating that, plaintiff's assertion notwithstanding, the case involved only the loss of money, rather than life or health.  The court reasoned that, "[t]o hold otherwise would transform every sophisticated confidence scheme into an action for intentional infliction of mental distress in clear derogation of the narrow scope accorded this tort by Pennsylvania courts."  565 F.Supp. at 499.

Conversely, in *Malandris v Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 703 F.2d 1152 (10th Cir. 1981), *cert. den.,* 464 U.S. 824 (1983), the court upheld a jury verdict in favor of plaintiffs on their IIED claim.  In *Malandris*, plaintiffs were a husband and wife who sought out defendants for assistance in maintaining funds saved and generated from limited stock investments.  Mr. Malandris had a limited education and his wife, a Korean immigrant, had none and was illiterate.  However, Mrs. Malandris was extremely conservative with their money and required that their funds be kept in an account bearing her name only, because of her husband's demonstrated gullibility for investment schemes.  Mrs. Malandris instructed Mr. Malandris to take their money to defendants and simply retain it in an account.  When Mr. Malandris met with a broker at defendants firm, however, and relayed his wife's wishes and her concerns about his handling their money, the broker persuaded Mr. Malandris to disregard his wife's wishes and concerns

21

and begin investing the money.  The broker began a campaign of manipulation of Mr.
Malandris by inducing him to agree to high risk investments by understating or
misrepresenting the risks, and inducing Mr. Malandris to forge his wife's signature on
documents authorizing transactions contrary to Mrs. Malandris' stated wishes.

Factually, this case is more analogous to *Kimmel*.  Plaintiff is an attorney and well
educated.  He does not claim to be unsophisticated regarding commodities investments.
Rather, he was the alleged victim of a well orchestrated scheme by individuals he
entrusted to make investments on his behalf, and he claims that Defendant A. Mady
subsequently breached an agreement to refund Plaintiff's losses.  Presuming Plaintiff's
claims to be true, Defendants' acts were certainly reprehensible.  However, as in
*Kimmel*, they ultimately only involve financial losses.  There is no indication that
Michigan courts would regard A. Mady's alleged actions as "extreme and outrageous"
for purposes of this claim.  Therefore, regardless of which theory Plaintiff is proceeding
under, the Court finds that Plaintiff failed to state a claim for IIED and grants
Defendants' motion.

### 2.    Negligent Infliction of Emotional Distress

Although not formally adopted,[9] Michigan courts have recognized a cause of
action for negligent infliction of emotional distress.  *Wargelin v Sisters of Mercy Health
Corp.,*149 Mich. App. 75 (1986).  To sustain such a claim, a Plaintiff must prove:  (1)
serious injury threatened or inflicted on a person, not the plaintiff, of a nature to cause

---

[9]*Hesse v Ashland Oil, Inc.,* 466 Mich. 21, 24 n. 6 (2002)(noting that NIED has not
been recognized by the Michigan Supreme Court and declining to decide the validity of
such an action).

severe mental disturbance to the plaintiff, (2) shock by the plaintiff from witnessing the event that results in the plaintiff's actual physical harm, (3) close relationship between the plaintiff and the injured person (parent, child, husband, or wife), and (4) presence of the plaintiff at the location of the accident at the time the accident occurred or, if not presence, at least shock "fairly contemporaneous" with the accident. *Id* at 81.

Plaintiff failed to allege any facts which support an NIED claim. Plaintiff's claim does not arise from his witness of an injury threatened or inflicted upon another with whom he had a close relationship, and he does not claim to have suffered the type of "definite and objective physical injury" required for such a claim. *See Daley v LaCroix*, 384 Mich. 4, 12 (1970); *Toms v McConnell*, 45 Mich. App. 647, 657 (1973). Plaintiff suggests in a footnote that he is not alleging a typical NIED claim. However, he does not cite any authority indicating that Michigan would recognize an "atypical" NIED claim under the allegations he asserts. Defendants' motion on this claim is granted.

### vii.   Count XII--Breach of Contract

In Count XII, Plaintiff alleges that after the CFTC complaint was filed in 2002, he and A. Mady entered into an agreement in which A. Mady agreed to repay Plaintiff the money he lost during his dealings with G. Mady. Consideration for the agreement, per Plaintiff, was his agreement to release the Mady Defendants from any claims arising from the events. However, Plaintiff alleges that A. Mady has not paid in accordance with the agreement. Defendant contends that this claim fails as a matter of law because 1) Plaintiff's allegations are vague, conclusory and fail to include the specific terms of the agreement, and 2) Plaintiff alleges that he entered into an oral agreement with A. Mady to repay the debt of another, which is barred by the statute of frauds. There is no

23

merit to either assertion.

"The essential elements of a contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement, and mutuality of obligation." *Mallory v City of Detroit,* 181 Mich. App. 121, 127 (1989). Plaintiff alleges that A. Mady offered to refund the monies he paid in exchange for Plaintiff's agreement not to pursue his legal remedies against both A. Mady and G. Mady. Plaintiff alleges that he accepted the offer and did delay in proceeding against the Mady Defendants. However, A. Mady never paid in accordance with their agreement. These allegations establish each element of a contract claim as well as breach by A. Mady.

Contrary to Defendant's assertion, the claim is not barred by the Michigan statute of frauds. Defendant is correct that the statute requires that "[a] special promise to answer for the debt, default, or misdoings of another person" be " in writing and signed with an authorized signature by the party to be charged with the agreement, contract, or promise[.]" M.C.L. §566.132(1)(b). However, in this case, Plaintiff does not merely allege an agreement by A. Mady to repay a debt owed by G. Mady. Rather, assuming the entirety of Plaintiff's factual allegations to be true, A. Mady agreed to repay a debt either *jointly* owed by A. Mady and G. Mady as co-conspirators or solely owed by A. Mady pursuant to his principal-agent relationship with G. Mady. An oral agreement to pay one's own debt or a joint debt does not come within the statute of frauds and is enforceable. *See Ortiz v Travelers Insurance Co.,* 2 Mich. App. 548, 552 (1966); *Gibbs v Blanchard*, 1867 W.L. 3318, *7 (Mich. 1867).

### viii.   Count XIII--Vicarious Liability

In Count XIII, Plaintiff alleges that the Mady Defendants acted within the course

24

and scope of their employment with Exclusive Realty in carrying out their alleged

unlawful acts, and that Exclusive Realty was a co-conspirator in the Mady Defendants'

alleged acts.  Therefore, Plaintiff alleges that Exclusive Realty is vicariously liable to

Plaintiff for the damages caused by the Mady Defendants, and that it is vicariously liable

as a co-conspirator with the Mady Defendants.

The doctrine of vicarious liability (also called "respondeat superior" liability) "'is

indirect responsibility imposed by operation of law.'"  *Cox ex rel. Cox v Board of Hosp.*

*Managers for City of Flint,* 467 Mich. 1, 12 (2002)(*quoting Theophelis v Lansing Gen.*

*Hosp.,* 430 Mich. 473, 483 (1988)).  The doctrine imposes liability upon an employer (or

principal) based on the reasoning that "'a master is responsible for the wrongful acts of

his servant committed while performing some duty within the scope of his employment.'"

*Rogers v J. B. Hunt Transport, Inc.,* 466 Mich. 645, 651 (2002).  However, "[a]n

employer is not vicariously liable for acts committed by its employees outside the scope

of employment, because the employee is not acting for the employer or under the

employer's control."  *Id.*

There are no factual allegations which support Plaintiff's conclusory assertion

that the alleged "Ponzi" scheme was carried out by the Mady Defendants within the

scope of their employment with Exclusive Realty.  Plaintiff alleges in the complaint that

Exclusive Realty acts as a real estate agent and broker in connection with the purchase

and sale of real estate.  *See* First Amended Complaint at ¶4.  There are no allegations

indicating that Exclusive Realty also handles commodities futures trading, or that it

authorized either of the Madys to engage in such trading on its behalf.  Further, Plaintiff

does not allege that A. Mady held G. Mady out as an employee of Exclusive Realty as a

25

means of inducing Plaintiff to invest with G. Mady, or that Plaintiff was otherwise under the impression that he was dealing with G. Mady in his capacity as an employee of Exclusive Realty.  There are simply no allegations which indicate, *prima facie*, that Defendants' employment with Exclusive Realty was a factor in furtherance of the alleged scheme.

Plaintiff's assertion that Exclusive Realty is a co-conspirator similarly lacks supporting facts.  Plaintiff asserts that the alleged conspiratorial acts were carried out by A. Mady in his position as President and CEO.  Again, however, there are no allegations which indicate that A. Mady participated in the scheme through Exclusive Realty or utilized the company to assist G. Mady in carrying out his alleged unlawful acts.

Plaintiff contends that it is enough under FRCP 8 that he simply state that the Mady Defendants were acting in the scope of their employment.  Plaintiff is wrong.  In fact, bald conclusions that are not supported by facts are not sufficient to state a claim. *See Delorean*, 991 F.2d at 1240 (A complaint "must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.").

### ix.     Count XIV--RICO Violations

In Count XIV, Plaintiff alleges that, in violation of RICO, 18 U.S.C. §1961, *et seq.,* all of the "Defendants and others, acting in concert and common enterprise, as co-conspirators, engaged in a pattern of unlawful activity extending over a period of several years for the purpose of[,] and with the effect[,] of defrauding Plaintiff" via the alleged "Ponzi" scheme.  First Amended Complaint at ¶98.  Plaintiff asserts that Defendants' scheme was perpetrated on Plaintiff and approximately 40-50 other residents of

26

southeastern Michigan, between 1999 and 2002, and resulted in losses exceeding $10 million.  Plaintiff alleges that Defendants conspired to conceal the scheme by falsely asserting to Plaintiff that his money was not lost, but was deposited in a Canadian bank and would be repaid.  Plaintiff says Defendants further conspired to tell him that A. Mady would make full restitution, which statement he relied upon.  However, no restitution was ever made.

RICO imposes criminal and civil liability on anyone who engages in certain "prohibited activities," identified in 18 U.S. C. §1692(a-d).  Specifically, liability may be imposed on any person: 1) who uses or invests income derived "from a pattern of racketeering activity" to acquire an interest in or to operate an enterprise engaged in interstate commerce, §1962(a); 2) who acquires or maintains an interest in or control of such an enterprise "through a pattern of racketeering activity," §1962(b); 3) who, being employed by or associated with such an enterprise, conducts or participates in the conduct of its affairs through a pattern of racketeering activity," §1962(c); 4) or, finally, who conspires to violate the first three subsections of §1962, §1962(d).  *H.J. Inc. v Northwestern Bell Telephone Company,* 492 U.S. 229, 232-233 (1989).

Therefore, to state a claim under §1962(a-c) a plaintiff must plead:

> (1) that a defendant "person," (2) through the commission of predicate criminal acts which constitute a "pattern" of "racketeering activity", (3) directly or indirectly invests in, or maintains an interest in, or participates in, (4) an "enterprise," the activities of which, (5) affect interstate or foreign commerce.

*DeLorean v Cork Gully,* 118 B.R. 932, 940 (1990).  One necessary element of each prohibited activity is either "a pattern of racketeering activity" or "collection of an

27

unlawful debt." *H.J. Inc.,* 492 U.S. at 232.  "'Racketeering activity' is defined in RICO [at 18 U.S.C. §1961(1)] to mean 'any act or threat involving' specified state-law crimes, any 'act' indictable under various specified federal statutes, and certain federal offenses." *Id.*  A pattern is at least two of the listed racketeering activities (otherwise called "predicate acts") within a 10-year period.  18 U.S.C. §1961(5).

Defendants contend that Plaintiff's claim is defective in several respects: 1) Plaintiff does not specify which subsection(s) of §1962 he is proceeding under;  2) Plaintiff failed to define the alleged enterprise; 3) Plaintiff failed to specify any predicate racketeering acts committed by any Defendant; and 4) although the claim is seemingly based on allegations of fraud, Plaintiff failed to plead fraud with the specificity required by FRCP 9(b).  Defendants are correct in many respects.

As Defendants assert, Plaintiff does not allege which provision or combination of provisions of the RICO statute he is proceeding under and it is not apparent.  Plaintiff does not even attempt to clarify his intention in his Response to Defendants' motion. Rather, Plaintiff simply says that FRCP 8 does not require dismissal for failure to specify a statutory subsection.  This response is wholly inadequate.  As noted in *James v Meow Media, Inc.,* 90 F.Supp.2d 798, 812 (W.D. Ky. 2000), each section of RICO requires a distinct analysis:  "Section 1962 prohibits various types of activity and provides different theories upon which to base a claim. . . . [Therefore], it is essential that a plaintiff specify upon which subsection of §1962 his cause of action is predicated."  Additionally, because Plaintiff has not identified which section(s) he purportedly brings his claim under, the Court is at a loss to determine whether Plaintiff's pleadings are adequate. *James*, 90 F.Supp. 2d at 812 ("Plaintiffs' failure to make specific reference to §1962

28

makes it difficult to discern for the purposes of the motion to dismiss whether they have stated a claim upon which relief can be granted.").   Moreover, it is the Plaintiff's burden in the face of a motion to dismiss to establish that his complaint states a claim under some viable theory.   *DeLorean*, 991 F.2d at 1240.  It is not up to the Court to simply "figure out" or guess the basis of Plaintiff's claims.

Second, Plaintiff does not expressly identify the alleged "enterprise" in his complaint, nor does he even attempt to clarify the question in his Response.  An "enterprise" is defined under RICO as "a group of persons associated together for a common purpose of engaging in a course of conduct."  *U.S. v Turkette,* 452 U.S. 576, 583 (1981),  An "association-in-fact" enterprise can be proven by showing: "1) that the associated persons formed an ongoing organization, formal or informal; 2) that they functioned as a continuing unit; and 3) that the organization was separate from the pattern of racketeering activity."  *VanDenBroeck v Commonpoint Mortgage Co.,* 210 F.3d 696, 699 (6th Cir. 2000).  These elements "have been interpreted to require a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach."  *Id.*  "That is, simply conspiring to commit a fraud is not enough to trigger the Act if the parties are not organized in a fashion that would enable them to function as a racketeering organization for other purposes."  *Id.*  "The "'hallmark of a RICO enterprise is its ability to exist apart from the pattern of wrongdoing.'"  *Id* (omitting citation).

What Plaintiff believes to be the enterprise relative to each Defendant is not

apparent.  More than one scenario is possible under Plaintiff's asserted facts[10] and the

burden is upon Plaintiff to state the claim clearly.  "Defendants are entitled to sufficient

information to know precisely which enterprise it is that they are alleged to have illegally

conducted through a pattern of racketeering activity."  *Hall American,* 726 F.Supp. at

1089-1090 (*quoting Beck v Cantor Fitzgerald & Co.,* 621 F.Supp. 1547, 1563 (N.D. Ill.

1985)).  Moreover, without clarification of what Plaintiff believes to be the "enterprise,"

the Court is unable to determine whether there is evidence of the requisite

organizational structure, that it functioned as a continuing unit, or that it exists for some

purpose other than the alleged fraudulent activities.

Third, Plaintiff does not delineate his allegations against each Defendant; he

simply lumps all references to them together.  This is particularly problematic with

respect to Exclusive Realty, because there are few specific allegations against

Exclusive Realty throughout the complaint, and in light of the finding above that Plaintiff

failed to establish a connection between the Mady Defendants' alleged fraudulent acts

and their employment with Exclusive Realty.

Finally, Plaintiff does not indicate what he relies upon as the predicate acts.

While the Court can perhaps glean what Plaintiff relies upon with respect to the Mady

Defendants, it is not apparent with regard to Exclusive Realty for the reasons stated.

Defendants' motion to dismiss this claim is granted.

**B.      DEFENDANT G. MADY'S MOTION FOR STAY**

---

[10]*See Hall American Center Associates Limited Partnership v Dick,* 726 F.Supp.
1083, 1090 n.13 (E.D. Mich. 1989)(citing example of possible variations of an enterprise
when just two businesses are alleged to have conspired together).

30

Defendant G. Mady requests that the Court stay these proceedings until the criminal charges pending against him are resolved.  It is undisputed that the criminal charges stem from the same set of facts on which this case is based.  Consequently, G. Mady asserts that, if he is required to present a defense in this case before the criminal charges are resolved, he may jeopardize his right to assert his Fifth Amendment privilege.

Plaintiff opposes a stay on several grounds.  First, he asserts that the pending criminal case does not automatically entitle G. Mady to a stay and that, typically, such a request is denied.  Second, he asserts that one instance where a stay is appropriate is when the government is bringing both the civil and criminal cases, which may result in abuse of the civil process to obtain an unfair advantage in the criminal action.  Because this case is brought by a civilian, Plaintiff contends that this concern does not apply. Third, Plaintiff points out that, during the CFTC case, G. Mady testified at length about his dealings with Plaintiff.  Therefore, Plaintiff says that G. Mady effectively waived privilege and cannot now refuse to testify on the same subject.  Lastly, Plaintiff contends that Defendant's assertion of privilege should be assessed in the context of specific questions, rather than as a blanket request.  For the reasons stated below, the Court finds that G. Mady has stated valid grounds for a stay.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself. . . ."  U.S. Const., Amend. V.  The Supreme Court has stated that "[t]his provision of the Amendment must be accorded liberal construction in favor of the right it was intended to secure."  *Hoffman v United States*, 341 U.S. 479, 486 (1951).

31

The Fifth Amendment privilege against self-incrimination may be invoked in civil as well as criminal proceedings. *United States v U.S. Currency,* 626 F.2d 11, 14 (6th Cir. 1980), *cert den.,* 449 U.S. 993 (1980). However, it is only properly invoked when the witness "has reasonable cause to apprehend a real danger of incrimination." *Morganroth v Fitzsimmons,* 718 F.2d 161, 167 (6th Cir. 1983); *Hoffman,* 341 U.S. at 486. That is, "'the information for which the privilege is claimed must harbor the potential of exposing the speaker to a criminal or quasi-criminal charge.'" *U.S. Currency,* 626 F.2d at 14 (*quoting In re Daley*, 549 F.2d 469, 478 (7th Cir. 1977), *cert den.,* 434 U.S. 829 (1977)). However, a witness may not baldly assert his belief that the privilege is validly asserted:

> The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself--his say-so does not of itself establish the hazard of incrimination.

*Hoffman*, 341 U.S. at 486. The witness must show a "'real danger,' and not a mere imaginary, remote or speculative possibility of prosecution." *Morganroth*, 718 F.2d at 167. It is for the trial court to decide whether the witness is entitled to invoke the privilege and the court has broad discretion in making that determination. *United States v Gaitan-Acevedo,* 148 F.3d 577, 588 (6th Cir. 1998), *cert. den.,* 525 U.S. 912 (1998); *Morganroth*, 718 F.2d at 167; *Hoffman,* 341 U.S. at 486. In doing so, the trial court should consider the facts in evidence and the court's "personal perception of the peculiarities of the case." *Hoffman,* 341 U.S. at 486.

In this case, G. Mady has already been charged based on the same allegations Plaintiff asserts here. Consequently, there is a clear danger that statements compelled or given by him in defense of Plaintiff's civil claims could be used to incriminate him in

32

the criminal case.   Denying G. Mady's request would put him in the position of having

to choose between preserving his right to invoke the Fifth Amendment privilege in the

criminal case or foregoing a defense in this civil matter.   District courts have the

discretion to relieve a defendant from making such a choice.   When civil proceedings

may interfere with a party's exercise of the privilege against self-incrimination, the trial

court may choose any means it deems appropriate under the circumstances to fairly

balance the interests of the parties, including a stay of the civil proceedings, entering a

protective order, or delaying discovery.[11]

A stay is warranted in light of the pending criminal charges against G. Mady.

And, although A. Mady has not been charged, at a minimum it is reasonable to presume

that G. Mady's testimony will be central to his defense.[12]   Consequently, simply staying

the case as to G. Mady alone would effectively preclude A. Mady from presenting a

complete defense.

There is no merit to Plaintiff's contention that G. Mady's prior testimony in the

CFTC civil case operates as a waiver of his right to invoke the Fifth Amendment.   A

court can deem a waiver when a witness voluntarily testifies to some extent on a

subject, but attempts *in the same proceeding* to invoke privilege against further inquiry.

*See Rogers v United States,* 340 U.S. 367, 373 (1951)("Disclosure of a fact waives

---

[11] *See United States v Kordel,* 397 U.S. 1, 8-9 (1970); *U.S. Currency,* 626 F.2d at
17; *United States v A Leasehold Interest in Property Located at 850 S. Maple,* 743
F.Supp. 505, 514 (E.D. Mich. 1990); *United States v Mellon Bank,* 545 F.2d 869, 873
(3rd Cir. 1976); *SEC v Dresser Industries, Inc.,* 628 F.2d 1368, 1376 (D.C. Cir. 1980),
*cert den.,* 449 U.S. 993 (1980); *Brock v Tolkow,* 109 F.R.D. 116, 120-121 (E.D. N.Y.
1985); *In re Phillips, Beckwith & Hall,* 896 F.Supp. 553, 557-558 (E.D. Va. 1995).

[12] All claims against Exclusive Realty have been dismissed by the Court.

33

privilege as to the details."). However, the majority view regarding whether waiver of privilege in one proceeding operates as a waiver in other unrelated proceedings is that waiver of privilege on a subject in one proceeding does not preclude one from invoking waiver on the same subject in an independent proceeding, if the witness is still at risk. *See Morganroth*, 718 F.2d at 165.[13]  The *Morganroth* Court noted that the rationale of the majority view is that "during the period between the successive proceedings conditions might have changed creating new grounds for apprehension, *e.g.,* the passage of new criminal law, or that the witness might be subject to different interrogation for different purposes at a subsequent proceeding, or that repetition of testimony in an independent proceeding might itself be incriminating, even if it merely repeated or acknowledged the witness' earlier testimony, because it could constitute an independent source of evidence against him or her."  *Id* (*citing In re Corrugated Container Antitrust Litigation, Conboy*, 661 F.2d 1145, 1155 (7th Cir. 1981), *aff'd*, 459 U.S. 248 (1983)).

The minority view is set out in *Ellis v United States*, 416 F.2d 791 (D.C. Cir. 1969), in which the Court held that a witness who voluntarily gives testimony before the grand jury without invoking the Fifth Amendment privilege cannot later claim privilege on the same subject at trial, when the witness is not the defendant or under indictment. The Court was not persuaded that courts should mechanically presume that a witness is in any greater jeopardy from the second disclosure than from the first: "We think the better rule is to hold that the waiver carries through unless there is new material, or

---

[13]The *Morganroth* Court declined to adopt a position on the issue, finding that it was not necessary for the Court to reach the question. 718 F.2d at 165.

34

possibly new conditions, that may give rise to further incrimination."  416 F.2d at 805 (footnote omitted).

Here, G. Mady gave testimony on his dealings with Plaintiff in a separate civil case prior to his indictment on federal charges.  Therefore, his prior testimony would not be deemed a waiver under either the majority or minority view.

Lastly, there is no merit to Plaintiff's suggestion that, rather than granting a stay of the entire case, the Court should require G. Mady to assert privilege to each question or request put to him.  "[A] court may forgo the question-by-question inquiry into the legitimacy or scope of the Fifth Amendment privilege where the witness face[s] a 'specter of further . . .  prosecution [that is] real.'" *Nunn v Michigan Department of Corrections,* 1998 W.L. 34113236, *2 (quoting *United States v Medina,* 992 F.2d 573, 586 (6th Cir. 1993)).   As stated, prosecution in this case is not merely a threat, it is a fact.  And, the facts and issues relative to both the civil and criminal cases are indisputably and inextricably intertwined.  Therefore, there is no question that G. Mady's assertion of privilege on questions involving his dealings with Plaintiff would be valid.  Consequently, requiring G. Mady to assert privilege in a piecemeal fashion would be futile and unduly burdensome.

## IV.     CONCLUSION

The Court **GRANTS** Defendant G. Mady's Motion for Stay.  This action is stayed until criminal action number 04-80408 is resolved against G. Mady.

Defendants A. Mady and Exclusive Realty's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART**:

A.   Defendants' motion on Count III (violation of consent order); Count XI (intentional and/or negligent and reckless infliction of emotional distress); Count XIII (vicarious liability); and, Count XIV (RICO Violations) is **GRANTED**.  However, because Counts III and XIV were brought against G. Mady as well, and he did not join in this motion, these counts continue against G. Mady;

B.   Defendants' motion on Counts VIII (conspiracy); Count X (aiding and abetting CEA violation); and, Count XII (breach of contract) is **DENIED;** and

C.   Defendants' motion on Count IX (actual and apparent agency) is **GRANTED IN PART**.  It will proceed only on Plaintiff's actual and apparent agency theory with respect to G. Mady's commodities futures trading activities.  Plaintiff's other theories under Count IX--actual and apparent agency based on employment with Exclusive Realty, and A. Mady's vicarious liability as an aider and abettor--are dismissed.

**IT IS SO ORDERED.**

  /S/ Victoria A. Roberts
**VICTORIA A. ROBERTS**
**Dated: 9/30/05**                                    **UNITED STATES DISTRICT COURT**

36